MOORE *et. al.*, *vs.* MICHIGAN CENTRAL RAILROAD COMPANY.

The agent of defendants, who were common carriers of personal property, in answer to inquiry by plaintiffs as to the best terms upon which defendants would transport flour from Niles to Buffalo, wrote them that defendants would deliver the property *on board* at Detroit, at certain named prices, remarking also that he did not like to contract east of Detroit, but thought plaintiffs would be able to get freights cheaper from Detroit without a contract than with. Plaintiffs accepting the proposition delivered their flour to defendants for transportation, and while in defendants' depot at Detroit it was destroyed by fire. *Held*, That here was a contract to deliver *on board* at Detroit, and until such delivery defendants' liability as common-carriers continued. *Held also*, That although the property when destroyed was in defendants' warehouse, they were not warehouse-men as to that property.

Case reserved from Cass County Circuit.

The facts of the case, as certified, are as follows:

The defendants have been for several years, and still are, common carriers of persons and property from Niles to Detroit. Under and by virtue of their act of incorporation granted by the Legislature, March 28th, 1846, W. D. Thompson was the regular station and freight agent for defendants at Niles at the date of the correspondence between him and plaintiffs, and others hereafter recited, and during the period of the business transactions hereinafter set forth. The plaintiffs, who were millers at Three Rivers, together with certain other persons, addressed the following letter to Thompson, bearing date July 25, 1850.

*W. D. Thompson.*

DEAR SIR,—As the time is approaching for the shipment of flour, we, the undersigned, wishing to make our arrangements for the fall business, would wish you to let us know the best we may expect from the Central Railroad Company from Niles to Buffalo for the fall business. We have met with the gentlemen from St. Joseph that have the warehouses at St. Joseph. When we receive your prices, we will determine which way we will ship.

Yours, respectfully,

(Signed)      MOORE & PRUTZMAN,

BOWMAN & HOFFMAN,

J. E. &. S. KELSEY.

In reply to which said Thompson wrote and sent a letter, a true copy of which is as follows:

NILES, July 29th, 1850.

*Messrs. Moore & Prutzman, and others.*

DEAR SIRS,—Your favor of the 25th inst. is at hand, and in reply I would say that I will deliver your flour on board at Detroit from Niles for 35c. per bbl., and pay you twenty dollars for each ark up to Oct. first. After that time the road, I think, will charge 40c., but not over forty, to the close of navigation. I do not like to contract east of Detroit, and I think you will be able to get your freights cheaper from Detroit without a contract than you would with. If you should send by the rail road, you can depend upon about the following prices—from Niles to Detroit 35c., from Detroit to Buffalo 10c., making 45c. to Buffalo, and 5 per cent off per bbl. for arks, leaving 40 cts. to Buffalo. This, I think, is cheaper than you can get your freight into Buffalo by the way of St. Joseph in the month of September. I am aware that the first shipments from St. Joseph will be made very low; but it is all folly for the people there to think they will remain low, as there is too much produce in the western country for freight to remain very low after the first shipments are made. We

Moore *et al.*, *vs.* Michigan Central Railroad Company.

charged you last season 35c. per bbl., and paid $20 for arks up to the 20th of September, and if that was a good arrangement, for you my proposition now is much better, as the time is extended ten days beyond that of last season, and the freights around the Lakes will be from 10c. to 15c. higher than they were last fall. If you should give us the whole of your business this fall, we shall charge you 35c. to Oct. first, and not over 40c. to the close of navigation; but those who only give us their business when freights are very high around the Lakes will have to pay the usual tariff prices, and it is evident that freights will go up very much before the close of navigation. And if you do go by the way of St. Joseph, I would advise you by all means to make a season contract, and one that you can rely upon. If not, you will be awfully disappointed in the price of freights, and that too in the month of September. I should like very much to do your business this fall, and if you make up your mind to send this way it shall be done up promptly and satisfactorily; and if you send this way, we would like to know it as soon as possible that we may be better prepared for it: therefore, please write.          Yours, &c.,

(Signed)         W. D. Thompson.

And in reply to this last letter, plaintiffs wrote and sent to said Thompson a letter, of which the following is a true copy:

Three Rivers, Aug. 13th, 1850.

*Mr. W. D. Thompson.*

Dear Sir—We have concluded to take up with the proposition to ship our flour by the rail road, and would say that we expect to be at Niles with an ark load about 21st or 22d, and would like to have it shipped immediately, say about 500 bbls. I believe Messrs. Bowman and Hoffman and Messrs. Kelseys expect to ship the same way, but will not have any to ship so soon. Yours, respectfully,

Moore & Prutzman.

It appeared further that subsequent to this correspondence,

the plaintiffs forwarded from time to time to defendants' depot, at Niles, divers quantities of flour, to be transported by defendants according to the agreement contained in aforesaid letters.

Thompson at this time carried on the business of transporting freight on the St. Joseph River on his private account, kept a private office at Niles, and had a clerk in such business, (B. F. Fish,) who was accustomed also to receipt, in the name of Thompson, property delivered at Niles to be sent over the rail road.

That on the afternoon of November 16th, 1850, plaintiffs delivered an ark load of flour (441 bbls., worth $3,50 per bbl., and being the flour in question) at defendants' depot at Niles; that a shipping bill accompanied the same; that said Fish receipted for the same across the face of said bill, a copy of which shipping bill and receipt is as follows:

"Shipped in good order, on board arks, Captain W. H. Smith, four hundred and fifty-three bbls. Flour, marked as follows, viz:

342 bbls. Moore & Prutzman, extra, Three Rivers Mill.

 90  "  Flowerfield Mills, S. Persing.

 21  "   "   "  G. Bristol.

453 bbls., to the care of Michigan Central Railroad, Niles, J. & C. Hitchcock, Buffalo, E. G. Frile & Co., New York, for account of       MOORE & PRUTZMAN."

(Endorsed,) "Rec'd four hundred forty-one bbls. Flour, Nov. 16, '50.      W. D. THOMPSON, pr. B. F. FISH."

That said bill so receipted was returned to plaintiffs, and was never seen or known of by Thompson till produced by plaintiffs at the trial; that said flour was received by defendants to be by them transported for plaintiffs, and there was no other evidence tending to show that any agreement subsequent to that contained in said letters had been made between the parties.

Said flour was on the next morning, which was Sunday, loaded into defendants' cars, started from Niles on same day, and in regular course arrived at Detroit in the afternoon or evening of November 18th; was on the evening of that day unloaded and stored in defendants' warehouse, where they store all property transported by them to Detroit on its arrival, and whence it is taken and shipped, if it is to go forward. This warehouse stands parallel with the dock, is eight hundred feet long, and about forty feet from the water.

With this flour was sent from Niles to Detroit a way bill.

Said Thompson had no authority to contract for the transportation of property by defendants beyond Detroit eastward, nor otherwise, except according to the usual course of business of defendants in the season of 1850; but said Thompson had authority to write said letter; and there was no evidence tending to show that plaintiffs had any notice of any want of authority in Thompson.

The regular tariff rate on flour from Niles to Detroit was forty cents per barrel, but Thompson had authority to make contracts to transport flour from Niles to Detroit up to October 1st, at thirty-five cents per barrel, and that the same should be exempt at Detroit from all storage and shipping charges.

The rule of defendants was, to charge storage on property consigned to any one at Detroit, which remained in warehouse twenty-four hours after notice; and when consigned only to defendants to go forward, if they are unable to ship it within twenty-four hours, they charge storage after that time; that defendants kept separate accounts for transportation and warehouse charges; that property transported from the St. Joseph Valley was exempted from warehouse charges, on account of coming in competition with lake transportation; and that defendants never made any shipping or dock charges for shipping from their warehouse on board vessels, property transported by them to Detroit and consigned to them to go forward.

Defendants had no transportation line from Detroit to Buffalo or New York, nor any freight vessels connected in line with them; defendants had a line of passenger boats running in line with them from Detroit to Buffalo, one of which, the Mayflower, was owned by them; but these boats carried but little freight, sometimes taking a few hundred barrels of flour.

That C. H. Hurd was the general freight agent of defendants at Detroit; that the flour in question was consigned to no one in Detroit unless to defendants, but was specially consigned to J. & C. Hitchcock, Buffalo; that it was defendants' custom to receive and transport to Detroit, property having no consignee other than defendants at Detroit, but specially consigned by the owner to Buffalo and other places east of Detroit, and in such cases to forward the property from Detroit according to the consignment in the bill of lading of the same, without any further instructions.

That there were five freight vessels at the defendants' dock the day the flour arrived—some unlading, and on one of which, at least, defendants made shipments on that day; that defendants have shipped freight in the evening, but this was out of the ordinary course of business, and only done for some special reason; but it did not appear whether the flour in question could or could not have been shipped the same evening it arrived. Nor was there any evidence tending to show that defendants made any inquiry to ascertain whether said flour could be shipped that evening, nor to show that they made any effort to ship it that evening.

Where property was transported by defendants to Detroit to be by them forwarded thence east by the bill of lading, it was the regular custom of defendants to collect their own charges on the property from the vessels on delivering it on board; and the only exceptions to this were some occasional omissions to collect for shipments on the regular passenger boats, when they got off early in the morning in a great hurry of business.

The transportation charges on this flour are marked paid on the books of the defendants, but there was no other evidence that they had ever in fact been paid; but it appeared that in keeping the accounts, the freight agent was originally charged with the freight on all the property received into the warehouse, and which was afterwards burned, and the entries in question might have been made to enable him to settle his accounts on the book of defendants.

Exhibit B is a copy of entries on the transportation books of defendants; that the following are true copies of two receipts given by said Fish, clerk of said Thompson:

"Rec'd in store, from Ark Capt. Pitts, Niles, April 17, '50, five hundred barrels Flour, (various brands,) to be forwarded to Mess. Pepoon & Olcott, New York, and J. & C. Hitchcock, Buffalo.

W. D. Thompson, Ag't,<br>By Benj. F. Fish."

"Rec'd in store, from Ark Capt. Pitts, Niles, April 26, 1850, to be forwarded to Mess. Pepoon & Olcott, N. York, care J. & C. Hitchcock, Buffalo, ninety barrels Flour, marked as follows, for a'c Mess. J. W. Talbot & Bro.

45 Portage Mill,      W. D. Thompson, Ag't,
36 Red    "        B. B. F. Fish."
 9 Lake.

That on Tuesday, November 19, at about one o'clock A. M., a fire broke out in defendant's said freight warehouse, and wholly consumed the same, with the property therein, including the flour in question; that Washington Gay and others were indicted for the offense of felonious burning of said warehouse, in the County Court for the county of Wayne, and were subsequently duly tried and convicted for the same; that said defendants had taken every precaution against fire, and kept a watchman regularly on the premises at night; that said fire was not the result of any carelessness or negligence on the part of the defendants; and that no precaution could have saved said flour from destruction.

*J. L. Jernegan*, for plaintiffs, presented and argued the following points:

1. The defendants, being common carriers, are liable for the loss of goods by fire, even though the fire was the work of an incendiary. (*Forward* vs. *Pittard*, 1 *Term Rep.* 27; *Abbot on Shipping*, P. 4, ch. 6, p. 389; *Hale* vs. *New Jersey Steam Navigation Co.*, 15 *Conn.* 539; *Angell on Carriers*, § 156.)

2. Their responsibility as common carriers did not cease until the goods arrived at the termination of their transit. (*Forward* vs. *Pittard*, 1 *T. Rep.* 27; *Gibson* vs. *Culver*, 17 *Wend.* 305; 2 *Mass.* 9 *Welch*, 624.)

3. The transit in this case, upon the most favorable construction for defendants, did not terminate until the goods were placed on board vessel at Detroit. (*Angell on Carriers*, § 135, 75, 131, 132, 134, 304–340; 1 *Term Rep.* 27; *James* vs. *Griffin*, 2 *M. & W.* 623; *Edwards* vs. *Brewer*, 2 *Id.* 375; *Dixon* vs. *Baldwin*, 5 *East.* 184; *Tucker* vs. *Humphrey*, 4 *Bing.* 516; *Thomas* vs. *Boston & Providence R. R. Co.*, 10 *Met.* 472; *Price* vs. *Powell*, 3 *Comst.* 322; 4 *T. Rep.* 581; 5 *T. Rep.* 389.)

4. The proviso to the 16th section of defendants' charter applies only to cases where goods are in their depots awaiting the order of or delivery to the owner *after the termination of the transit.* (*Angell on Carriers*, § 282 and note 1, §§ 294–8, 300; 10 *Met.* 472.)

5. In this case there was also an implied undertaking upon the part of the defendants to transport the flour to Buffalo, and they are, consequently, liable for losses occurring on any part of the route in respect to which the contract was made. (*Charter*, § 17; *Weed* vs. *Schenectady & Saratoga R. R. Co.*, 19 *Wend.* 534; *Muschamp* vs. *Lancaster & Preston Railway*, 2 *Eng. Railway and Canal Cases*, 607; 8 *M. & W.* 472; *Wilcox* vs. *Parmelee*, 3 *Sandford*, 610; *Watson* vs. *The Ambergate &c. Railway*, 3 *Eng. Law and Eq. Rep.* 497.)

6. Want of authority on the part of the Agent to contract east of Detroit, will not relieve the defendants from responsibility, without proof that plaintiffs had notice of such want of authority. (*Chouteau* vs. *Steamboat St. Anthony*, 11 *Missouri*, 226; *Story on Ag.*, § 127; *Smith's Mercantile Law, p.* 59.)

*Lothrop & Duffield* and *A. D. Fraser*, for defendants, submitted and argued the following points:

1. The count against defendants as warehousemen cannot be sustained, because this liability arises only in case of loss or damage by negligence; and the finding expressly negatives all negligence. (*Story Bail.*, § 444 et seq.)

2. And *trover* lies against bailee only where there has been a wrongful conversion, or a loss by negligence. (*Ross* vs. *Johnson*, 5 *Burr.* 2826; *Packard* vs. *Getman*, 4 *Wend.* 613; *Hallenbake* vs. *Fish*, 8 *Wend.* 548; *Hawkins* vs. *Hoffman*, 6 *Hill*, 586; *Moses* vs. *Norris*, 4 *N. Hamp.* 304.)

3. Can the plaintiffs recover against the defendants as common carriers? This will be determined by ascertaining in what capacity the defendants held the flour at the time of the fire.

Our position is that the defendants held the flour as warehousemen only.

1. The defendants transported the flour either under the express contract of Thompson's letter, or under the implied contract arising upon the acceptance of the property. In either case we contend the defendants are not liable.

In the first place, the two-fold character of carriers and warehousemen possessed by the defendants is to be observed. Their charter has expressly declared, "that *in all cases* the said Company shall be responsible for goods in deposit in any of the depots, awaiting delivery, as warehousemen and not as common carriers." (*Laws* 1846, *p.* 53, § 16.) "Awaiting delivery" is the antithesis of *awaiting carriage*. This was with the intention of adapting the law to the nature of rail road transportation. Carriage beyond the terminus of

their road was impracticable. When they put goods transported into their warehouse, the carriage was actually at an end; justice and good sense required that the liability of the carrier should be deemed also at an end.

Such, too, is the general doctrine of the common law. (*Angell on Carriers*, § 75–301 et seq.; *Story Bail.*, §§ 445–6–7–8; *Thomas* vs. *Day*, 4 *Esp. R.* 262; *Garside* vs. *T. & M. Nav. Co.*, 4 *Term R.* 581; In re *Webb*, 8 *Taunt.* 483, *per Dallas and Park, J. J.*; *Chickering* vs. *Fowler*, 4 *Pick.* 371; *Ackley* vs. *Kellogg*, 8 *Cow.* 223; *Van Santvoord* vs. *St. John*, 6 *Hill*, 167; *Fisk* vs. *Newton*, 1 *Denio*, 45; *Goold* vs. *Chapin*, 10 *Barb. S. C. R.* 616; *Thomas* vs. *Boston & Prov. R. R. Co.*, 10 *Met.* 472; *F. & M. Bank* vs. *Champ. Trans. Co.*, 18 *Verm.* 140.)

An apt illustration of this point is furnished by those cases of carriers by water, where the owner and master of the ship is also consignee and factor for the sale of the goods carried. (*Story Bail.*, § 546; *Cope* vs. *Cordova*, 1 *Rawle*, 203.)

But it is insisted that the contract was to "deliver on board," and therefore the carriage was not complete till the flour was placed on ship-board. But this construction would do violence to the intention of the parties. The proposition contained in plaintiff's letter to Thompson was for a contract to Buffalo; the latter, in his reply, declined to contract east of Detroit. The usage of the Company shows that they dealt with property transported by them to Detroit as warehousemen and forwarders in storing and shipping it. Defendants evidently contracted in both these capacities. The contract of transportation was by their road—their usual mode; they declined a contract for further carriage. Their contract to put on board from their warehouse was as warehousemen. It seems absurd to treat the delivery out of their warehouse to vessels immediately alongside as a *further carriage*. It is the natural and proper duty of a warehouseman. Why has it not that character here?

Contracts and acts are always explained by local usages of

business. (*Angell on Carriers*, 301 et seq.; *Gibson* vs. *Culver*, 17 *Wend.* 307; *Van Santvoord* vs. *St. John*, 6 *Hill* 160–6; *F. & M. Bank* vs. *Champ. Trans. co.*, 18 *Verm.* 139; *S. C.*, 16 *Verm.* 62.)

And a transportation and delivery according to the regular and established usage of the carriers in their business is sufficient whether the usage was known to the consignee or not. And *a fortiori* this must prevail where the customary mode of transportation and delivery arises necessarily from the nature of the business, as in railway and steamboat lines. (*Van Santvoord* vs. *St John*, 6 *Hill* 160; *F. & M. Bank.* vs. *Champ. Trans. co.*, 18 *Verm.* 139.)

And simple contracts, especially when found in business letters, are to be construed reasonably according to what may appear to be the fair intent of the parties, looking to the entire transaction, the laws of the State, the nature of the business and any usage or custom affecting it. (*Bell* vs. *Bruin*, 1 *How.* 185; *Royalton* vs. *R. & W. Turnpike co.*, 14 *Verm.* 311; *Robinson* vs. *Fiske*, 12 *Shep.* 401; *Merrill* vs. *Gore*, 16 *Shep.* 346; *Washburn* vs. *Gould*, 3 *Story* 162; *Stebbins* vs. *Leowolf*, 3 *Cush.* 137; *Bost. & M. R. R. co.* vs. *Babcock*, 3 *Cush.* 228.)

Besides, Thompson had no authority to contract for transportation except according to the usual mode of business of the Company; and we submit that there is nothing in the contract to forbid a construction consistent therewith.

2. Nor can the result be different if the Court holds that the defendants transported the goods under the implied contract arising from their acceptance of the same. Their undertaking was to transport and deliver the same according to their usage. The cases already cited establish this. The fact that they were directed to a place east of the terminus of defendant's road, will not make defendants carriers beyond such terminus, but only warehousemen and forwarders. The case of *Muschamp* vs. the Lancaster and Preston Junction Railway Company, 8 M. and W. 421, does not differ from the

American cases, *except in point of evidence.* This case holds the acceptance of goods marked to a destination beyond the terminus of the route of the carrier who receives them, as *prima facie* evidence of an undertaking to carry them to the place of destination; but this evidence may be rebutted. Finally it appears that when the property was lost, all actual carriage of it by defendants was ended. It had been placed in warehouse, where the charter declared the liabilities of warehousemen, and not carriers to prevail.

. As to stoppage in *transitu*, the rule is that when goods have reached the end of the route and are placed at the disposal of the vender, the transit is at an end, though the goods remain in the hands of the carrier, subject to his liens. (4 *Eng. C. L.*, 28.)

By the Court, JOHNSON, J.

From the facts found in this case, it becomes necessary to determine, first, what have the defendants undertaken to do, and secondly, what are their liabilities growing out of that undertaking.

The plaintiff, who resided in Three Rivers in 1850, wrote to Wm. D. Thompson, one of the agents of defendants residing at Niles, expressing a desire to make arrangements for the transportation of their flour from that place to Buffalo, for the ensuing fall, and requested that he would communicate to them the best terms the company would make.

In answer to this letter, Mr. Thompson, among other things, says: "I will deliver your flour *on board* at Detroit from Niles, for 35c. per bbl., up to the first of October; after that time, the road I think will charge 40c. but not over forty to the close of navigation. I do not like to contract east of Detroit, and I think you will be able to get your freights cheaper from Detroit without a contract than you would with." Much more was written in this letter, but nothing it is believed that would materially change or qualify in any manner the purport and legal effect of the language above quoted.

This letter bears date July 29th, 1850, and on the 13th of August following, the plaintiff's by letter addressed to Thompson, accept of this proposition.

The flour in question was received under this contract, at Niles, and transported to Detroit, and there deposited in defendants' depot, on the evening of the 18th of November, and early on the morning of the 19th, was destroyed by fire.

The plaintiffs insist that here is a clear, distinct and definite undertaking on the part of the defendants to receive the flour at Niles, and deliver it on board at Detroit, in furtherance of its destination eastward.

The defendants on the other hand insist that the language of the foregoing correspondence should be construed in reference to the ordinary customs of the Company, their usual mode and manner of doing business as found in the facts in the case. That the term *on board* means nothing more than that they would, after the property was removed from the cars into their depot, in the capacity of forwarding merchants or warehouse-men, and in pursuance of their usual custom, see that the property was put *on board* some suitable water craft for its transportation east.

This then seems to become material—to determine whether here was a special agreement to deliver this property on board at Detroit, or at their depot in Detroit, which it is acknowledged would have been the implied undertaking from the reception of the property generally without any special agreement.

This becomes material for the purpose of determining in what capacity the defendants held the property at the time of its destruction.

The plaintiffs insisting that, upon their construction of the contract, the defendants must be deemed to act as common carriers until the flour was delivered *on board* some ship, while the defendants contend under their construction, that they ceased to act in that character as soon as the property

was deposited in their depot, and consequently only chargeable for negligence.

It is not denied, but expressly admitted on the argument, that Thompson, whatever may be the construction of the contract, had the authority to make it, and we are therefore to determine from the language of this correspondence, and from such other facts as are proper to be considered from the record, what was the real intention of the parties.

The plaintiff's request to Thompson was, for the best *terms* the Company would make them for transporting their flour from Niles to Buffalo.

It is presumable from this letter, (and such conclusively appears from the examination of the whole record,) that unless they should receive some acceptable proposition from the Company, they designed to ship their flour by some other route, and hence the letter was written.

Thompson informs them that they did not like to contract east of Detroit, but upon the terms before stated, he would deliver their flour *on board* at Detroit. He held out to them at the same time, inducements, by stating "that he thought they would be able to get their freights cheaper from Detroit without a contract than they would with."

The property was consigned to J. & C. Hitchcock, Buffalo. There was no consignee at Detroit, and *evidently because,* by the terms of this contract, none was required. We refer to this circumstance, for the purpose of showing that the plaintiffs attention must have been called to the distinct terms of this contract. That the term *on board* was by them considered as the operative and descriptive term expressive of the extent and character of the defendants' engagement.

And we believe it must have been a consideration with the plaintiffs, in accepting this proposition, that they were thereby incurring no expense in the storage and transhipment at Detroit. Would not the difference between the delivery of this property *on board* at Detroit, and in defendants' depot, in De-

troit, readily occur to an ordinary business man? Had they not a right to say, and are we not bound to presume they did say, in accepting *this* proposition in lieu of the one they made, they incurred simply the hazard of paying extra freight from Detroit to Buffalo.

In seeking the intention of the parties, we must not be unmindful of the object to be accomplished. The plaintiffs had in view the safest and cheapest mode for the transportation of their property to an eastern market. In accepting this proposition, we are to presume they took into consideration every circumstance having a tendency to promote that object. In this, they were to be at no trouble or expense at Detroit. The flour was to be received at Niles, and delivered *on board* for transportation to Buffalo, without any new engagement for freightage.

It would have been competent for the plaintiffs to have employed a particular carrier on the lake, and in that case to have instructed the defendant, upon the arrival of the property at Detroit, to hold it subject to the order of such carrier, and then their duty would have been completed and ended upon the deposit of the property in their warehouse, but no such order was given, showing that the plaintiffs were relying upon their contract, that the defendants would ship the flour for its eastern destination without any specific directions.

It is urged that we should not apply a rigid rule of construction to a contract drawn in the hasty and indeliberate manner this appears to have been done, that we should not be bound by its literal terms, but look beyond it in arriving at the intention of the parties. This is what we have endeavored to do; let us proceed with it a little further. Here was a competition between this Company and the carriers around the lakes. This was alluded to in the plaintiffs' letter to Thompson, and Thompson in his reply discussed at some length the advantages and disadvantages of the respective

routes. He was anxious to secure their business by making them the most favorable proposition he could. He saw what they wanted; not to have their property transported to Detroit, but to Buffalo. I do not like, says he, to contract east of Detroit, but I will deliver your flour *on board* at Detroit. We think this term *on board* was used by Thompson understandingly and deliberately, and with the full intention of conveying to them the distinct idea, that they were to incur no expense at Detroit in shipping their flour, and that an idea so distinctly expressed, and so important in its result, could not have been overlooked by the plaintiffs in their acceptance of the proposition.

But it is said that even though it be conceded that *here* was a special contract, it must be taken with and construed in reference to the regulations and customs of the Company. That ordinarily, property received by them for transportation east, would, as of necessity, be deposited in their depot prior to its being shipped on board, and upon such deposit the duty of the Company as common carriers would end. And that after that time they would act, if at all, in the capacity of forwarding merchants or warehousemen, and that such custom was shown on the trial of this cause.

We are not called upon to say what the effects of this custom would have been in this case, had a knowledge of it been brought home to the plaintiffs, but it does not appear from the facts found, nor indeed from anything that appears of record, that they had any knowledge of the particular manner in which the Company transacted their business, nor does it appear that they even knew that the Company had a depot or warehouse in Detroit.

If the defendants seek to modify this contract by a custom, they must show that both parties acted in reference to it.

It is analogous to those cases where a party seeks to avoid an implied legal obligation by a particular usage or custom. To do that so as to make the *general* law yield to a particular

one, it is essential that he should not only show the particular custom and usage to exist, but he should show enough to warrant the presumption that both parties'acted in reference to it.

We think no such presumption can be raised in this case. We are therefore to determine the intention of the parties from the language of the contract, and from such other circumstances in the case as may properly be considered with it. We have attempted to do so. There is nothing ambiguous or doubtful in its terms. There are no circumstances to warrant the assumption that the parties did not mean precisely what they expressed, and we are of opinion, then, that the contract was to deliver on board, and not at Detroit generally.

Having determined this point in the case, it would seem to follow that the defendants could not escape the responsibility which the law attaches to common carriers. They having undertaken, by the reception of the property under the special contract, to transport it to a given place, and the same having been destroyed before that undertaking is accomplished, it seems only necessary to inquire in what capacity they received it, for the purpose of determining their liability.

It is, however, very strongly and ingeniously urged in behalf of the defendant, that under the express contract, as well as the implied one resulting from the reception of the property generally, they are only liable as warehousemen after the deposit of the property in their depot. That even conceding the engagement was to deliver *on board*, yet while it was actually in the warehouse they held it in the capacity of warehousemen. This position, we think, is not maintainable. The implied undertaking resulting from the reception of the property generally, would have required them to have carried it no further than the terminus of the route, and there being no consignee *there* and no further special duty for them to perform, their implied contract as carrier would terminate upon the deposit of the property in the depot. The law settling the extent of the duty would also settle the extent of the liability.

But by this special contract nothing is implied, nothing can be. They have agreed to do a specific thing; they have agreed to deliver the property at a particular place, and in doing this it may be convenient for them to remove the property from the cars to the depot, but they cannot become warehousemen until they first do what they have engaged to do as carriers. The point of delivery was beyond the depot, and if it had been removed three months it would still have been in *transitu.*

This doctrine is established in the case of Hyde *vs.* the Trent. & Mersey Nav. Company, 5 Term. R. 387, cited by plaintiffs.

It is attempted on the part of the defendants to distinguish that case from the one at bar. It is insisted that *that* case was not decided on the general question of the liabilities of defendants, but on the distinct ground " that the cartage of the goods was demanded of and paid by plaintiffs before the goods were put on board the defendants' vessel, and from that circumstance the defendants undertook to deliver the goods at the place to which the carts were to carry them."

This, says the counsel, was the turning point in the case, and so we understand it.

The Court said, that inasmuch as the defendants had received pay for cartage, it was evidence of a special contract to do something more than to deliver the goods in the warehouse at the termination of their transit. They had agreed to deliver the property to the plaintiff personally, that is, to cart it from their warehouse to the plaintiff's residence, and until it was so personally delivered, they were liable as common carriers.

*Then* it was not the receipt of the money for cartage that took it out of general rule, but a special contract which the payment of the money proved, that made the defendants liable.

And so it may be said in this case, in the absence of any special contract the defendants would have discharged themselves as common carriers by the deposit of the property in their depot, because that is all the contract would have im-

plied from a reception of the property generally. The depot being the place where goods are usually deposited on their arrival from the west, or in other words, it being the eastern termination of their transit.

But we have found in this case precisely what the court found in the case above cited, viz.: a special contract to carry beyond the ordinary terminus of their respective routes. In that case they were to cart it from their warehouse to the plaintiff's residence. In this case they were to remove it from the depot *on board.* The court held in that case, that until they had fulfilled that special contract, they continued common carriers. The doctrine of that case has never been overturned or questioned, it never can be upon principle, and it is precisely anologous to the case at bar. In that case there was a special contract to deliver the property to the plaintiff personally; it was destroyed by fire in their depot before such delivery.

Here was a special contract to deliver the property *on board;* it was destroyed by fire in their depot before such delivery. In that case the court held the defendants liable as common carriers, because their undertaking had not been completed; at the destruction of the property it was still in transitu.

In this case the Court must hold the same. The case of Gardside *vs.* Trent. & Mersey Nav. Co., (4 *Term R.* 581,) cited by defendants, is not in point. There the property was received by the carrier with specific instructions to deliver it to the order of the next carrier. It had been carried to Manchester and deposited in the defendants' warehouse, and was, when destroyed, awaiting the order of the carrier from Manchester to Stockport. The defendants had fulfilled their engagement, they had done everything they had undertaken to do, and consequently were discharged as common carriers. This case then bears no analogy to the case of *Hyde* above cited.

6

It is distinguishable *in this,* that in the one case the defendants had fulfilled their contract before the destruction of the property; in the other they had not.

But it is unnecessary to farther examine the authorities referred to on the argument; there will be none found to conflict with the principle we have before stated.

Besides, *this whole case* depends upon the nature of the contract, and having found that there was a special contract to deliver *on board, that* finding disposes of the case; there can be no serious contest about the application of the law.

We are therefore of the opinion that it should be certified to the Circuit Court, as the opinion of this Court, that the plaintiffs have judgment for the value of their flour.